## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BYRON ENERGY INC.** | * | **CIVIL ACTION NO.: 2:14-cv-01773** |
| **VERSUS** | * | **SECTION** |
| **SPARTAN OFFSHORE DRILLING, LLC** | * | **JUDGE** |
| | | **MAG. JUDGE** |

\*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

Plaintiff, Byron Energy Inc. ("Byron"), for its complaint and request for declaratory judgment against defendant, Spartan Offshore Drilling, LLC ("Spartan"), avers as follows.

**1.**

The claims set forth herein are within the admiralty and maritime subject matter jurisdiction of the court, pursuant to 28 U.S.C. § 1333, and designated as admiralty claims in accordance with Rule 9(h) of the Federal Rules of Civil Procedure.

**2.**

For claims in admiralty, venue is deemed to be coextensive with personal jurisdiction; therefore, venue is proper in any district court that can exercise personal jurisdiction over the defendants. *In re McDonnell–Douglas Corp.*, 647 F.2d 515, 516 (5th Cir. 1981). A district court can exercise personal jurisdiction over any defendant that is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located. Fed. R. Civ. P. 4(k)(1)(A). Venue is proper for these claims because Spartan is subject to the general jurisdiction of Louisiana courts.

**3.**

Plaintiff Byron is a Delaware corporation, licensed and doing business in the State of Louisiana.

**4.**

Defendant Spartan is a Louisiana limited liability company, licensed and doing business in the State of Louisiana.

**5.**

Spartan is an oil and gas drilling contractor. It holds itself out to the public as having vast experience in the business of jack-up well drilling, workover, and completion services throughout the Gulf of Mexico. It advertises itself as providing a superior level of service that is unmatched by larger firms. It claims to be focused on excellence and service in everything it does.

**6.**

At all relevant times, Spartan was and is the owner and/or operator of the A-1 Self-Elevating Mobile Offshore Drilling Unit "Spartan Rig 202" (the "Rig 202").

**7.**

Byron holds a federal lease over the South Marsh Island Block 006 ("SMI 6").

**8.**

On October 14, 2013, Byron and Spartan entered into an "Offshore Daywork Drilling Contract," later amended on June 16, 2014 (the "Contract"). Under the terms of the Contract, Spartan agreed to provide drilling services, labor, and equipment (including the Rig 202) for the purpose of drilling offshore wells and providing auxiliary operations at SMI 6.

**9.**

The Contract required Spartan to perform all of the work on a "daywork" basis. Under this term, Spartan was required to (1) furnish equipment and labor that was suitable for the intended work, and (2) perform its obligations efficiently, with due diligence, and in a good and workmanlike manner.

**10.**

In exchange for Spartan's performance of the work in the required manner, Byron agreed to pay Spartan according to certain daily rates.

**11.**

The applicable rate was based on certain conditions. Under normal drilling conditions, Spartan was to be paid a defined "Operating Rate" for all work completed in accordance with the Contract's requirements.

**12.**

The Contract also specified a different rate during periods of "Repair Time." Under the Contract, Spartan was entitled to a "Repair Rate" for periods during which it had to halt operations to repair equipment. To avoid the potential for excessive downtime, the Contract provided that Spartan would receive the "Repair Rate" for limited periods: eight hours per occurrence, up to a maximum of twenty-four hours in any calendar month. Spartan was not entitled to payment for any "Repair Time" that exceeded these limits.

**13.**

The Contract permitted termination by Byron in certain circumstances. The Contract stipulated that, if Spartan failed to conduct work in accordance with the Contract's requirements,

or if it failed to furnish or maintain equipment that was suitable for the requested intended work, then Byron could notice these deficiencies to Spartan. Then, if Spartan failed or refused to correct the deficiencies, Byron was entitled to terminate the Contract. In that case, the Contract obligated Byron to pay only (1) any applicable demobilization fee and (2) any amount due for previous work performed "in accordance with [the] Contract."

**14.**

The work contemplated by the Contract commenced in May 2014. The Rig 202 arrived at SMI 6 on May 17, 2014. After jacking up, the Rig 202 commenced drilling.

**15.**

Spartan's drilling operations were plagued with inefficient work and equipment failures. Among other things, the Rig 202's top drive (a rig appurtenance that turns the drill pipe) broke down nine times. The rig's generator sets failed on numerous occasions as well. Under the Contract, Byron does not owe Spartan for work that was not performed within the standards set forth. These failures resulted in downtime that exceeded the contractually allotted "Repair Time," for which Spartan unfairly charged Byron. The failures also caused Byron to pay costs to its vessel suppliers and other vendors standing by at the lease site (*i.e.*, "marine spread" costs), which payments were wasted because such vessels and vendors were idle while the Rig 202 was under repair.

**16.**

Byron planned for a well with a depth of 9,560 feet. When the initial attempt was unsuccessful, Byron requested that Spartan drill a "bypass" well bore, which was also unsuccessful. It was then agreed that Spartan would conduct a third attempt to reach the objective on July 1, 2014.

Drilling this bypass required a smaller drill pipe (*i.e.*, 2 7/8") and drill bit. To initiate this third

attempt, Byron was required to file permits with the federal government, which were approved on

July 3, 2014.

**17.**

Byron alerted Spartan that 2 7/8" inch pipe was to be used for this third attempt. On July

3, 2014, Byron gave Spartan a copy of its approved bypass permit, which specified 2 7/8" drill

pipe.

**18.**

Thereafter, on July 8, 2014, Byron sent these same pipe specifications to Spartan person-

nel at Rig 202. These specifications, calling for drilling with 2 7/8" pipe, were tacked to Spartan's

"Offshore Installation Manager's" (rig supervisor's) wallboard. Another copy of the specifica-

tions was placed in the driller's console notebook on the rig floor.

**19.**

Further, the 2 7/8" drill pipe was delivered to Rig 202 on July 19, 2014.

**20.**

Soon after Spartan began the third attempt to reach the objective, the Rig 202's top drive

failed to drill with the 2 7/8" pipe. As a result of the top drive's failure, the drill pipe became irre-

trievably stuck, frustrating the effort.

**21.**

Spartan knew or should have known that its equipment was not capable of drilling with 2

7/8" pipe in a safe, timely, and efficient manner. Spartan did not disclose this fact to Byron, how-

ever. Instead, by its statements and/or conduct, Spartan represented that it and its equipment were capable of carrying out the requested task.

**22.**

On July 26, 2014, twenty-three days after Spartan received the relevant pipe specifications, Spartan belatedly notified Byron that its top drive was incapable of drilling with the 2 7/8" drill pipe. In later communications with Byron, Spartan implied or otherwise indicated that it had not been advised of Byron's 2 7/8" pipe specifications in advance of the drilling operation. Spartan indicated that, had it known that 2 7/8" drill pipe would be used, it could have made preparations to be able to drill with this size pipe.

**23.**

Byron sent to Spartan a notice specifying its dissatisfaction that Spartan had not provided equipment that was suitable to perform the requested drilling operations. Spartan refused to remedy the deficiency. Instead, it offered to continue with the third attempt using its unsuitable top drive in "connection mode," an unsafe, illegal, inefficient, and unsuitable method.

**24.**

Faced with Spartan's refusal to correct the deficiencies and its misrepresentations regarding those deficiencies, Byron was forced to stop the work and terminate the Contract.

**FIRST CAUSE OF ACTION:**
**RESCISSION FOR ERROR**

**25.**

Byron repeats and re-alleges all prior paragraphs as if fully set forth herein.

**26.**

Consent to a contract may be vitiated by error or mistake. Byron and Spartan agreed to undertake the 2 7/8" pipe bypass drilling operation based on error. The parties proceeded under the false impression that Spartan's equipment was suitable for this operation. Because the equipment's drilling capabilities were essential to the goal of the operation—drilling the desired well— the parties would not have agreed to the operation if they had known the truth.

**27.**

Alternatively, Byron's consent to the operation was vitiated by unilateral error or mistake. Byron was unaware of the extent of the deficiencies with, among other things, the Rig 202's top drive. Spartan's representations, by its word and/or conduct, regarding the fitness and suitability of its equipment caused Byron's mistaken understanding of the facts. The purpose for Byron's engaging in the 2 7/8" pipe bypass operation was to drill the well to a certain objective, as Spartan was fully aware. Byron would not have agreed to undertake this particular operation if it had known the truth about Spartan's unsuitable equipment.

**28.**

Because Byron's consent to the 2 7/8" pipe drilling operation was vitiated by error, it is entitled to rescission of the Contract dating back to July 3, the date on which the 2 7/8" bypass operation commenced, and to be restored to its pre-agreement position. Further, insofar as Byron was misled by Spartan's negligent, grossly negligent, and/or intentional misstatements or failure to disclose true facts, and/or bad faith, Byron is entitled to recover its damages that were a direct, foreseeable, and proximate result of its contracting in error, which include, but are not limited to,

marine-spread costs, "lost in hole" costs, lost profits, payment of operating and repair rates, which it is entitled to recoup, and other amounts that will be established at trial.

## SECOND CAUSE OF ACTION:
## DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL

**29.**

Byron repeats and re-alleges all prior paragraphs as if fully set forth herein.

**30.**

Spartan represented, expressly and/or through its conduct, that its equipment was capable of drilling the well to the final objective with 2 7/8" pipe. Because Spartan holds itself out as an experienced well driller with operations throughout the Gulf of Mexico, Byron reasonably relied on Spartan's expertise, superior knowledge of its own equipment, and representations that Spartan could drill with the pipe that Byron had specified. Byron changed its position to its detriment by continuing to invest significant sums of money into a drilling operation (*i.e.*, using the 2 7/8" pipe) that was doomed from the start, which Byron would not have done had it known the truth.

**31.**

As a direct, foreseeable, and proximate result of Byron's reasonable reliance on Spartan's representations, Byron suffered damages including, but not limited to, marine-spread costs, "lost in hole" costs, lost profits, payment of operating and repair rates, which it is entitled to recoup, and other amounts that will be established at trial.

## THIRD CAUSE OF ACTION:
## BREACH OF CONTRACT

**32.**

Byron repeats and re-alleges all prior paragraphs as if fully set forth herein.

**33.**

In the alternative, Spartan, through its course of conduct, breached the Contract with Byron, in the following non-exhaustive particulars:

a. failing to drill the well as agreed;

b. failing to properly train its employees;

c. failing to provide a drilling rig and equipment suitable to perform required contractual duties;

d. not disclosing the limitations on its equipment;

e. negligence, gross negligence, intentional misconduct and/or bad faith; and

f. other ways, to be shown at trial.

**34.**

As a direct, foreseeable, and proximate result of Spartan's breach of contract, Byron suffered damages including, but not limited to, marine spread costs, "lost in hole" costs, lost profits, payment for work not performed in accordance with the terms of the Contract and/or any overpayment for "Repair Time," which it is entitled to recoup, and other amounts that will be established at trial.

**FOURTH CAUSE OF ACTION:**
**NEGLIGENT AND/OR INTENTIONAL MISREPRESENTATION**

**35.**

Byron repeats and re-alleges all prior paragraphs as if fully set forth herein.

**36.**

In the course of its contractual dealings with Byron, Spartan supplied untrue information, through its representations and/or conduct, regarding the capabilities of its equipment. Specifi-

cally, Spartan knew that Bryon had specified drilling with 2 7/8" pipe. And it represented to Byron that its equipment was capable of drilling with that size pipe. Under the terms of the Contract, Spartan maintained complete control over its work and its equipment. In making the untrue representation, Spartan either intentionally misrepresented or failed to exercise due care to discover and communicate to Byron the truth about its equipment. This amounts to negligent, grossly negligent, and/or intentional misrepresentation or failure to disclose true facts and/or bad faith. Because Spartan holds itself out as an experienced well driller with operations throughout the Gulf of Mexico, Byron reasonably relied on Spartan's expertise, superior knowledge of its own equipment, and representations that Spartan could drill with the pipe that Byron had specified.

**37.**

As a direct, foreseeable, and proximate result of Spartan's negligent, grossly negligent, and/or intentional misstatements or failure to disclose true facts, and/or bad faith, Byron suffered damages, including, but not limited to, marine-spread costs, "lost in hole" costs, lost profits, payment of operating and repair rates, which it is entitled to recoup, and other amounts that will be established at trial.

**WHEREFORE**, Byron prays that:

a. Process be issued against Spartan and that it be summoned to appear and answer the allegations of this Complaint;

b. The Court, after due proceedings, enter judgment in favor of Byron and against Spartan in the amount of Byron's damages, together with pre- and post-judgment interest, litigation expenses, and costs;

c.  The Court, after due proceedings, render a declaratory judgment in favor of Byron and against Spartan, declaring that no additional money is owed to Spartan for any as-yet unpaid invoices under any rate set forth in the contract;

d.  The Court, after due proceedings, award as damages reimbursement of payments made to Spartan that were not due and other direct damages (including marine-spread costs) incurred as a result of Spartan's negligent, grossly negligent, and/or intentional actions and misrepresentations and/or bad faith; and

e.  The Court grant Byron all other general, special, and equitable relief, including attorney's fees and costs, to which it is entitled, under any theory whatsoever, whether specifically pleaded or not.

Respectfully submitted,

s/      Thomas M. Flanagan
Thomas M. Flanagan (#19569)
Harold J. Flanagan (#24091)
Brandon C. Briscoe (#29542)
Andy Dupre (#32437)
Anders F. Holmgren (#34597)
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 2405
New Orleans, LA 70170
Telephone: (504) 569-0235
Facsimile: (504) 592-0251

Attorneys for Byron Energy Inc.